***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of *Page 2 
these proceedings.
2. The parties are properly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
3. The parties were subject to the North Carolina Workers' Compensation Act at the time of Plaintiff's alleged work injury.
4. An employment relationship existed between the parties at the time of Plaintiff's alleged work injury.
5. Defendant-Employer is WECC, Inc., and Defendant-Carrier provided workers' compensation insurance coverage for this matter.
6. Plaintiff alleges that he sustained a work injury on August 19, 2008.
7. The nature of Plaintiff's alleged August 19, 2008 work injury is to his head.
8. Defendants paid Plaintiff for the entire day of his alleged August 19, 2008 work injury.
9. Plaintiff last worked for Defendant-Employer on August 19, 2008.
10. Plaintiff's average weekly wage at the time of his alleged August 19, 2008 work injury is to be determined by a Form 22.
11. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One (1) — Pre-Trial Agreement;
 b. Stipulated Exhibit Two (2) — Various documents, including:
 i. Plaintiff's medical records;
 ii. Discovery responses;
 iii. North Carolina Industrial Commission forms and filings; *Page 3 
 iv. Plaintiff's recorded statement;
 c. Stipulated Exhibit Three (3) — Plaintiff's wage records from Olsten Temporary Staffing.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer on August 19, 2008, and if so, to what workers' compensation benefits is he entitled?
2. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 22 years old, with a date of birth of March 21, 1988. Plaintiff has a high school diploma, and as of the date of the hearing before the Deputy Commissioner, resided in Latta, South Carolina. In December 2007, Defendant-Employer hired Plaintiff as a general laborer working approximately 40 hours per week, and earning $9.00 per hour.
2. Defendant-Employer's business includes preparing road beds. In that capacity, Plaintiff's duties included picking up trash, running a steel drum roller, operating a pan, putting down silk fences, using a sledgehammer, and cording. The cording process involves using a pick-axe in order to dig holes in a rock road and then using a ruler to make sure that the rock is six (6) inches in depth. The road is cored in locations marked by an inspector, and these *Page 4 
locations are approximately every 50 to 100 feet. Plaintiff and his co-workers would dig two (2) to four (4) holes at each coring location. Once the holes are dug at a particular coring location, Plaintiff and his co-workers would ride on the open tailgate of the pick-up truck to travel to the next coring location 50 to 100 feet away. The pick-up truck would travel at a speed of between five (5) and 15 miles per hour while Plaintiff and Mr. Dial rode on the open tailgate.
3. On August 19, 2008, Plaintiff was working for Defendant-Employer in Manteo, North Carolina. On the way to the work site, Plaintiff and his co-worker that day, Mr. Allison "Yogi" Dial, rode in the front of the pick-up truck with the driver. When they reached the location where their coring duties began, Mr. Dial and Plaintiff got out of the pick-up truck and started digging the holes. Following their usual practice, after digging holes at each coring site, Mr. Dial and Plaintiff would sit on the open tailgate of the pick-up truck with feet hanging downward and ride to the next coring location 50 to 100 feet away.
5. Plaintiff recalled digging just a few holes on August 19, 2008 and the next thing he remembered was waking up in the hospital in Norfolk, Virginia with severe head injuries. Plaintiff was unable to recall how he sustained his August 19, 2008 work injury.
6. Mr. Dial recalled that August 19, 2008 was a hot, clear day. According to Mr. Dial, while riding on the open tailgate of the pick-up truck to a coring location, he lit a cigarette and placed his pack of cigarettes on the tailgate. The wind blew Mr. Dial's cigarettes off of the open tailgate of the pick-up truck. Plaintiff said he would get the cigarettes and immediately slid off or pushed himself off the tailgate to retrieve the cigarettes. The truck was moving at a speed of between five (5) to fifteen 15 miles per hour. As Plaintiff slid or pushed himself off the tailgate, his feet hit the stone road, throwing him backwards. Plaintiff was unconscious when Mr. Dial reached him. *Page 5 
7. An ambulance transported Plaintiff to Sentara Norfolk General Hospital in Norfolk, Virginia, where a computed tomography (CT) scan of the head revealed a mild amount of subarachnoid hemorrhage with a possible tiny subdural component at the left high frontal lobes, but no mass effect or parenchymal abnormality. Initially, Dr. Scott Frederic Reed, a general and critical care surgeon, saw Plaintiff and diagnosed him with a bilateral subarachnoid hemorrhage and concussion with combative behavior requiring endotracheal intubation and sedation. Dr. Reed ordered a consultation with Dr. Paul B. Mitchell, a neurosurgeon.
8. Dr. Mitchell diagnosed Plaintiff with a traumatic subarachnoid hemorrhage, and concluded that he would not need surgical intervention. On August 20, 2008, Plaintiff underwent another head CT scan, which revealed some slight progression of the bleeding, and some contusions or bruising within the brain. Dr. Mitchell was of the opinion that these findings were not unusual, as it typically takes several weeks for bleeding in the brain to completely resolve, and small bruises that are not initially seen can appear over time. Dr. Mitchell further opined that although Plaintiff was not neurologically unstable at this time, he was not completely back to his baseline.
9. On August 21, 2008, Dr. Reed discharged Plaintiff since he was no longer exhibiting signs of confusion and had stable vital signs. Dr. Reed instructed Plaintiff to follow up with Dr. Mitchell in a month for a repeat head CT scan. Dr. Reed later opined that if Plaintiff was having continued complaints of nausea and imbalance, then he should forego activities requiring driving or working at heights. However, Dr. Reed did not assign Plaintiff any specific work restrictions when he discharged him from the hospital.
10. When Plaintiff returned home to Latta, South Carolina, he was unable to undertake many activities without the assistance of his parents, and he experienced severe *Page 6 
headaches "that would feel like your head was about to bust [sic]," and dizziness to the point that he could not walk without falling down. Over the next several weeks, Plaintiff remained at home with his parents and slept a great deal. According to Plaintiff, he felt "worthless" and as though he "couldn't do nothing [sic] without help." Although Plaintiff's complaints of headaches and dizziness have been improving over time, as of the date of the hearing before the Deputy Commissioner, he continued to suffer from headaches and dizziness, though not as severe as they were immediately after his August 19, 2008 work injury.
11. On September 17, 2008, Plaintiff presented to Dr. Dennis Michael Jensen, a family medicine specialist and his primary care provider. Dr. Jensen noted that Plaintiff continued to experience headaches following his August 19, 2008 work injury, and that his pain medication caused vomiting. In addition, Dr. Jensen noted that Plaintiff had a past medical history significant for mental retardation. Dr. Jensen ordered a repeat head CT scan, and released him to return to work.
12. On October 2, 2008, Plaintiff underwent a repeat head CT scan, which revealed no evidence of either a subarachnoid or intracerebral hemorrhage, and no evidence of either a subdural or epidural hematoma. Although Plaintiff's October 2, 2008 head CT scan was within normal limits, Dr. Jensen recommended that Plaintiff obtain a neurological consultation. Plaintiff has yet to undergo this neurological consultation due to the denial of his workers' compensation claim and his lack of health insurance. Dr. Jensen later opined that it may take several years for Plaintiff's neurological symptoms to resolve, and recommended that he avoid activity that would place him at a higher risk of sustaining another head injury.
13. Dr. Mitchell was of the opinion that Plaintiff's August 19, 2008 work injury caused the traumatic subarachnoid hemorrhage that he diagnosed. With regard to work *Page 7 
restrictions, Dr. Mitchell explained that with patients like Plaintiff who have traumatic head injuries, it is his standard practice to have them follow up in a month for a repeat head CT scan, and if it is within normal limits, then he would release them to return to work, depending upon the type of work. However, Dr. Mitchell was aware that Plaintiff lived in another state, and would likely follow up with a physician more local to him.
14. The Full Commission finds that it was reasonable, under the circumstances, for Plaintiff to follow up with Dr. Jensen, his local, primary care physician. The Full Commission further finds that had Plaintiff followed up with him, Dr. Mitchell would have kept Plaintiff out of work for at least one (1) month pending the results of a repeat head CT scan, per his standard practice with patients who have traumatic head injuries.
15. Following Plaintiff's August 19, 2008 work injury, Defendant-Employer did not contact him regarding returning to work. Thus, Plaintiff began making a reasonable search for other employment on his own. On March 9, 2009, Plaintiff began working at Dillon Perdue Hatchery in Dillon, South Carolina through Olsten Temporary Staffing. Plaintiff's job duties in this position did not require any heavy lifting or working at heights. According to the payroll records from Dillon Perdue Hatchery stipulated into evidence, Plaintiff worked there from March 9, 2009 through March 26, 2009 making $8.00 per hour, and working approximately 40 hours per week. As of the date of the hearing before the Deputy Commissioner, Plaintiff was to begin working again for Dillon Perdue Hatchery making $9.00 per hour, and the payroll records reflect that he did begin working again on April 23, 2009 at that rate of pay.
16. The Full Commission finds, based upon the greater weight of the evidence, that on August 19, 2008, Plaintiff was in the course and scope of his employment as he was riding on the open tailgate of the pick-up truck alongside Mr. Dial traveling to the next coring location. *Page 8 
There is no evidence establishing that Defendant-Employer prohibited smoking while riding on the back of the pick-up truck or while working. Plaintiff's conduct in sliding or pushing himself off the open tailgate of a slow moving pick-up truck to retrieve his co-workers cigarettes under the circumstances of this case was not so unreasonable and does not amount to such outrageous conduct as to fall outside the course and scope of his employment with Defendant-Employer. The Full Commission finds that Plaintiff's conduct did not constitute a significant departure from the realm of acceptable employee practices under the circumstances for his type of employment.
17. Part of the customary and established duties of both Plaintiff and Mr. Dial were to ride on the open tailgate of the pick-up truck when traveling to the next coring location. The pick-up truck neither deviated nor detoured from its course at any time during the period preceding Plaintiff's injury. Plaintiff did not deviate or detour from his course of employment in the seconds it took him to push himself off of the open tailgate of the pick-up truck in order to retrieve Mr. Dial's cigarettes.
18. Plaintiff's decision to retrieve Mr. Dial's cigarettes for him may have only indirectly benefitted Defendant-Employer; however, his actions would have nonetheless provided some benefit to Defendant-Employer by reducing the time in which the coring process would have been interrupted for Mr. Dial to go back and retrieve his cigarettes after traveling some distance to coring locations further down the road. Although Mr. Dial testified that he had another pack of cigarettes in his lunch box and that he "didn't pay it no attention [sic]" to the fact that his cigarettes fell off of the open tailgate of the pick-up truck, there is no evidence that Plaintiff was aware of this fact.
19. The Full Commission finds, based upon the greater weight of the evidence, that on August 19, 2008, Plaintiff sustained a compensable injury by accident arising out of and in *Page 9 
the course and scope of his employment with Defendant-Employer when he pushed himself off of the open tailgate of the pick-up truck that he was riding in the back of in order to retrieve Mr. Dial's cigarettes and hit the stone road, thereby sustaining a head injury.
20. According to the Form 22's stipulated into evidence, Plaintiff worked for Defendant-Employer over a period of fewer than 52 weeks in the year preceding his August 19, 2008 work injury. Including partial weeks worked, Plaintiff worked for Defendant-Employer a total of 35 weeks, and earned a gross income of $14,806.13. Because Plaintiff worked for Defendant-Employer over a period of fewer than 52 weeks in the year preceding his August 19, 2008 work injury, methods one (1) and two (2) under N.C. Gen. Stat. § 97-2(5) cannot be used. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's average weekly wage should be calculated by using method three (3) under N.C. Gen. Stat. § 97-2(5), because his work for Defendant-Employer extended over a period of fewer than 52 weeks in the year preceding his August 19, 2008 work injury and this method would yield results that are fair and just to both parties.
21. Applying method three (3) under N.C. Gen. Stat. § 97-2(5), Plaintiff worked 35 weeks for Defendant-Employer and earned a gross income of $14,267.13, which yields an average weekly wage of $426.79, and a corresponding compensation rate of $284.54.
22. Defendants had reasonable grounds to defend this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. For a claim to be compensable under the North Carolina Workers' Compensation Act, *Page 10 
a plaintiff must sustain an injury by accident arising out of and in the course of the employment. N.C. Gen. Stat. § 97-2(6) (2009). An injury arises out of the employment when there is some causal relationship between the employment and the injury for which the claimant is seeking workers' compensation benefits. Bare v. WaynePoultry Co., 70 N.C. App. 88, 318 S.E.2d 534 (1984), cert.denied, 312 N.C. 796, 325 S.E.2d 484 (1985). Although the employment need not be the sole cause of the injury, there must be a reasonable relationship between the injury and employment.McGrady v. Olsten Corp.,59 N.C. App. 643, 583 S.E.2d 371 (2003). "To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." Troxler v. CharterMandala Center, 89 N.C. App. 268, 365 S.E.2d 665 (1988). "If an employee departs from that purpose to accomplish a purpose of his own, the principal is not liable." Id. "[An employer] is not liable if the employee departed, however briefly, from his duties in order to accomplish a purpose of his own, which purpose was not incidental to the work he was employed to do." Wegner v.Delly-Land Delicatessen, Inc.,270 N.C. 62, 153 S.E.2d 804 (1967). However, so long as the activity in which the plaintiff is engaged in "is calculated to further, directly or indirectly, the employer's business," then the activity is within the course of the plaintiff's employment. Powers v.Lady's Funeral Home,306 N.C. 728, 730, 295 S.E.2d 473, 475 (1982).
2. In the case at bar, on August 19, 2008, Plaintiff was in the course and scope of his employment as he was riding on the open tailgate of the pick-up truck alongside Mr. Allison "Yogi" Dial traveling to the next coring location. Plaintiff continued to be in the course and scope of his employment and about his work when he pushed himself off of the open tailgate of the pick-up truck in order to retrieve Mr. Dial's cigarettes for him. Parker v.Burlington Indus., 78 N.C. App. 517, 337 S.E.2d 589 (1985). *Page 11 
3. Part of the customary and established duties of both Plaintiff and Mr. Dial were to ride on the open tailgate of the pick-up truck when traveling to the next coring location. "[T]here were no rules or regulations posted or furnished, in writing or orally, which prohibited" Plaintiff and his co-workers from riding on the open tailgate of the pick-up truck when traveling to the next coring location. Williams v. Hydro Print, Inc.,65 N.C. App. 1, 12, 308 S.E.2d 478, 485 (1983). Similarly, there was no prohibition against running during rest breaks inWilliams, where the North Carolina Court of Appeals upheld an award of compensation to the plaintiff when he sustained a work injury by running toward a shiny object on a railroad track during a scheduled rest break.
4. The Williams court further noted that "[p]laintiff's impulsive running to satisfy his curiosity, if such it was, was not unreasonable under the circumstances and did not constitute a significant departure from the realm of acceptable employee practices on the premises." Id.
In the case at bar, the pick-up truck upon which Plaintiff rode with his fellow employees neither deviated nor detoured from its course at any time during the incident in question. Thus, Plaintiff did not deviate or detour from his course of employment in the seconds it took him to push himself off of the open tailgate of the pick-up truck in order to retrieve Mr. Dial's cigarettes. Here, Plaintiff was not on a rest break; however, the plaintiff inWilliams was on a rest break. Id. Thus, it would stand to reason that Plaintiff's decision to retrieve Mr. Dial's pack of cigarettes while riding on the open tailgate of the pick-up truck when traveling to the next coring location, which was an authorized duty of his employment, would not be "unreasonable under the circumstances and did not constitute a significant departure from the realm of acceptable employee practices." Id. *Page 12 
5. Plaintiff's decision to retrieve Mr. Dial's cigarettes for him may have only indirectly benefitted Defendant-Employer; however, his actions would have nonetheless provided some benefit to Defendant-Employer by reducing the time in which the coring process would have been interrupted for Mr. Dial to go back and retrieve his cigarettes after traveling some distance to coring locations further down the road. Powers, 306 N.C. 728, 295 S.E.2d 473 (1982). Although Mr. Dial testified that he had another pack of cigarettes in his lunch box and that he "didn't pay it no attention [sic]" that his cigarettes fell off of the pick-up truck, there is no evidence that Plaintiff was aware of this fact.
6. Plaintiff's act of pushing himself off of the pick-up truck in order to retrieve Mr. Dial's cigarettes for him does not amount to such outrageous conduct and/or unreasonable activity as to fall outside the course and scope of his employment with Defendant-Employer. Hartley v. North Carolina PrisonDepartment, 258 N.C. 287, 128 S.E. 2d 598 (1962); Williams v.Hydro Print, Inc.,65 N.C. App. 1, 12, 308 S.E.2d 478, 485 (1983).
7. On August 19, 2008, Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6) (2009).
8. In the case at bar, methods one (1) and two (2) under N.C. Gen. Stat. § 97-2(5) cannot be used because Plaintiff's work *Page 13 
for Defendant-Employer extended over a period of fewer than 52 weeks in the year preceding his August 19, 2008 work injury. N.C. Gen. Stat. § 97-2(5) (2009); McAninch v. BuncombeCity Schools, 347 N.C. 126, 489 S.E.2d 375 (1997); Conyers v.New Hanover County Schools,188 N.C. App. 253, 654 S.E.2d 745 (2008); Bond v. Foster Masonry,Inc., 139 N.C. App. 123, 532 S.E.2d 583 (2000). Plaintiff's average weekly wage should be calculated by using method three (3) under N.C. Gen. Stat. § 97-2(5), because his work for Defendant-Employer extended over a period of fewer than 52 weeks in the year preceding his August 19, 2008 work injury and this method would yield results that are fair and just to both parties. Under this method, Plaintiff's earnings are divided by the number of weeks or parts thereof that he worked for Defendant-Employer. Thus, methods four (4) and five (5) are not reached. N.C. Gen. Stat. § 97-2(5) (2009); McAninch,347 N.C. 126, 489 S.E.2d 375 (1997); Conyers,188 N.C. App. 253, 654 S.E.2d 745 (2008); Bond,139 N.C. App. 123, 532 S.E.2d 583 (2000).
9. Applying method three (3) under N.C. Gen. Stat. § 97-2(5), Plaintiff worked 35 weeks for Defendant-Employer and earned a gross income of $14,267.13, which yields an average weekly wage of $426.79, and a corresponding compensation rate of $284.54. N.C. Gen. Stat. § 97-2(5) (2009).
10. As a result of Plaintiff's August 19, 2008 work injury, he is entitled to temporary total disability compensation from August 19, 2008 through March 8, 2009. N.C. Gen. Stat. § 97-29 (2009).
11. As a result of Plaintiff's August 19, 2008 work injury, he is entitled to temporary partial disability compensation from March 9, 2009 and continuing, as the evidence of record indicates that Plaintiff remains unable to earn his pre-injury average weekly wage. N.C. Gen. Stat. § 97-30 (2009).
12. As a result of Plaintiff's August 19, 2008 work injury, Plaintiff is entitled to have Defendants pay for all medical treatment reasonably related to this work injury, including, but not limited to the follow-up neurological consultation recommended by Dr. Scott Frederic Reed, Dr. Paul B. Mitchell, and Dr. Dennis Michael Jensen, and/or other treatment as recommended as a result of the neurological consultation. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2009). *Page 14 
13. Defendants defended this claim with reasonable grounds. N.C. Gen. Stat. § 97-88.1 (2009).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $284.54 per week from August 19, 2008 through March 8, 2009. The accrued compensation shall be paid in a lump sum.
2. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary partial disability compensation to Plaintiff at the rate of 66 2/3 percent of the difference between his average weekly wage before his August 19, 2008 work injury and his average weekly wage from March 9, 2009 for up to 300 weeks. The accrued compensation shall be paid in a lump sum.
3. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's August 19, 2008 work injury, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act. Defendants shall immediately authorize, arrange, and pay for the follow-up neurological consultation recommended by Dr. Scott Frederic Reed, Dr. Paul B. Mitchell, and Dr. Dennis Michael Jensen.
4. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraphs one (1) and two (2), above. Defendants *Page 15 
shall deduct and pay directly to Plaintiff's counsel 25 percent of the accrued compensation owed to Plaintiff.
5. Defendants shall pay the costs of these proceedings.
This the ___ day of April 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER